1

2                          341 Meeting

3

4                     September 28, 2016

5

6          In Re:  Planet Merchant Processing, Inc.

7

8                     Case No. 16-81243

9

10

11

12          TRANSCRIPT FROM AUDIO RECORDING

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Julie A. Pell, RPR, CRR, CSR, General

Notary Public, do hereby certify that the transcript

of these proceedings was prepared from an audio

recording made available to me by the Office of the

United States Trustee, and that although I was not

present during the recording of these proceedings, I

transcribed the following pages and they are a true

and accurate representation of the recording made.

IN TESTIMONY WHEREOF, I have hereunto set my

hand at Lincoln, Nebraska, this 17th day of October,

2016.

JULIE A. PELL, RPR, CRR, CSR
General Notary Public

General Notary - State of Nebraska
JULIE A. PELL
My Comm. Exp. June 30, 2019.

*341 Meeting*

```
 1              (The following proceedings occurred on
 2    September 28, 2016, as follows:)
 3              TRUSTEE JENSEN:  We're here today on
 4    September 28th, 2016, to conduct a Section 341 first
 5    reading of creditors in the Chapter 11 case of Planet
 6    Merchant Processing, Incorporated, Case
 7    Number 16-81243.
 8              My name is Jerry Jensen.  I am an attorney
 9    in the Office of the United States Trustee, a
10    division of the U.S. Department of Justice.  Today's
11    meeting is required under Section 341 of the
12    bankruptcy code.
13              The purpose of the meeting is to allow for
14    an examination under oath.  Questions may include,
15    but are not limited to, why the case was filed, the
16    operation of the business and the prospects for
17    reorganization.
18              I will initially ask the debtor's
19    representative some questions.  Then I'll give a --
20    an -- creditors an opportunity to enter their
21    appearance and ask any questions that they would
22    like.
23              As a reminder, the meeting is being
24    digitally recorded, so remember to give verbal
25    responses which can be picked up on the recorder.
```

1   The U.S. Trustee maintains a recording of the

2   proceeding.  If anyone would like to obtain a

3   duplicate of today's proceeding or a transcript,

4   arrangements may be made through the U.S. Trustee's

5   Office.

6           And would counsel for the debtor please

7   enter his appearance?

8           MR. KING:  Please show the appearance of

9   Sam King for Planet Merchant Processing.

10           TRUSTEE JENSEN:  Thank you.

11           And, Mr. O'Brien, would you please state

12   your name and position with the corporation for the

13   record?

14           MR. O'BRIEN:  Dennis O'Brien, president of

15   debtor.

16           TRUSTEE JENSEN:  Okay.  And would you

17   please raise your right hand to be sworn in?

18                 DENNIS O'BRIEN,

19       Of lawful age, being first duly cautioned and
         solemnly sworn as hereinafter certified, was
20                 examined and testified as follows:

21       (Witness' response to oath - "Yes.")

22           TRUSTEE JENSEN:  Okay.  Thank you.

23                 EXAMINATION

24   BY TRUSTEE JENSEN:

25       Q.  And how long have you served as president of

*O'BRIEN - Examination*

```
 1    the corporation?

 2         A.   Six weeks.

 3         Q.   Okay.  And were you involved in any other

 4    capacity with the company prior to being president?

 5         A.   Yes.

 6         Q.   Okay.

 7         A.   I am on the board of directors.

 8         Q.   Okay.  And what are your responsibilities as

 9    president?

10         A.   To oversee and guide the operations of the

11    business.

12         Q.   Are you involved in the day-to-day

13    operations?

14         A.   Day to day?  No.

15         Q.   Okay.  Who was the former president of the

16    corporation?

17         A.   Tom Nichting.

18         Q.   And why did he -- and why was he replaced by

19    you?

20         A.   Why I replaced him?  He did not want to be

21    associated with the bankruptcy if he didn't have to

22    be.

23         Q.   Okay.  Why did the debtor file the

24    Chapter 11 case?  What was the main reason that you

25    needed to file for bankruptcy relief?
```

*O'BRIEN - Examination*

1       A.   Because we were losing money.

2       Q.   Approximately how long has Planet Merchant

3  been in business?

4       A.   More than ten years.

5       Q.   Okay.  Has the business changed during those

6  ten years at all or has it pretty much done the same

7  type of business?

8       A.   Same type of business throughout.

9       Q.   Okay.  What's the current status of the

10 business operations of the -- is it -- is the debtor

11 operating at the present time?

12      A.   Yes.

13      Q.   Okay.  And what is it doing right now?

14      A.   It is developing its software, continuing --

15 continuing to maintain its software.

16      Q.   Is it continuing to provide any services to

17 the customers at this time?

18      A.   No.

19      Q.   Okay.  When did it stop providing services,

20 approximately?

21      A.   Yeah.  About a week ago.

22           MR. KING:  Yeah.  It was right when we had

23 the preliminary injunction hearing, which I think was

24 the 13th.

25      Q.   (By Trustee Jensen)  Okay.  Are there any

7

*O'BRIEN - Examination*

1   related entities to Mer- -- Planet Merchant

2   Processing?

3       A.   "Related entities."   What do you mean by

4   that?

5       Q.   Okay.   Planet Merchant -- well, let's just

6   go through the structure, I guess.   Planet Merchant,

7   it's my understanding, is owned by Planet Group,

8   Incorporated; is that correct?

9       A.   Yes.

10      Q.   Okay.

11      A.   Hundred percent.

12      Q.   Okay.   And what does Planet Group,

13  Incorporated, do?   Is that just a holding company, or

14  is that an operating entity of any kind?

15      A.   It's a holding company.

16      Q.   Okay.   Does Planet Group, Incorporated, own

17  other entities also?

18      A.   Planet Group?

19      Q.   Yeah.

20      A.   Yes.   It owns Workpoint, LLC.   It owns

21  Planet Consulting.   It owns -- Planet Consulting is

22  an LLC.   It owns Planet Correspondence Technologies,

23  Inc., and then it owns the debtor.

24      Q.   Okay.   Does the debtor currently have any

25  employees?

*O'BRIEN - Examination*

1          A.  Um...

2          Q.  Or -- and if not, explain it to me, how that

3     works, I guess to the best -- and...

4          A.  So from a practical standpoint, yes, I think

5     of these employees as -- these people as employees.

6     From a legal aspect, I am not really sure how they're

7     classified.  But, yeah, about 25 people involved in

8     the operation of the business.

9          Q.  Okay.  But they may be technically employees

10    of a different entity, is my understanding, to Planet

11    Group, Inc.?

12         A.  Yes.

13         Q.  Is that...

14         A.  That's correct.

15         Q.  And are those 25 people still working at the

16    present time?

17         A.  Yeah.

18         Q.  So they're still continuing to operate,

19    whatever they're doing, developing software or -- is

20    that...

21         A.  Yes.

22         Q.  Okay.  Have any employees left since the

23    filing of the case?

24         A.  No.

25         Q.  What are the plans for the restructuring of

*O'BRIEN - Examination*

1    the bu- -- of the debtor or any other plans that --

2    with regards to what you plan to do in the bankruptcy

3    proceeding?

4         A.  So step one is to reject the contracts.

5    Step two is to try to renegotiate the contracts, and

6    then step three would be, if both of those fail, then

7    we would look at an orderly sale of the company.

8         Q.  So at the present time the contracts have

9    been rejected, so you're working on step two at the

10   present time, trying to renegotiate the contracts?

11   Is that correct?

12        A.  I...

13        Q.  Or what is the status of...

14        A.  The debtor has made two offers since the

15   filing, two offers to the customers to renegotiate

16   the contracts, and there has been no counter.

17        Q.  And it's my understanding there are four --

18   four customers?  Is that correct?

19        A.  Yes.  Yes.

20        Q.  Have there been other customers in the past

21   or has it always been these four customers that have

22   been customers of...

23        A.  In the nine years that I have been involved,

24   there was one other customer for a period of about a

25   year called Mercury Payments.

*O'BRIEN - Examination*

1          Q.  All right.  Now I am going to ask some

2    questions from the schedules that you filed at this

3    time.  Did you sign the petition, schedules,

4    statements and related documents, and is the

5    signature your own?

6          A.  Yes.

7          Q.  Did you read those documents before you

8    signed them?

9          A.  Yes.

10         Q.  And are you personally familiar with the

11   information contained in those schedules and

12   documents?

13         A.  For the most part, yes.

14         Q.  Okay.  To the best of your knowledge is the

15   information contained in the petitions, schedules and

16   statements true and correct?

17         A.  Yes.

18         Q.  Are all of your assets identified in the

19   schedules?

20         A.  Yes.

21         Q.  Have you listed all of the creditors on the

22   schedules?

23         A.  Yes.

24         Q.  Okay.  And Schedule A indicates no real

25   estate is owned by the corporation; is that correct?

O'BRIEN - Examination

1        A.   Yes.

2        Q.   Okay.   Does the debtor lease the space that

3   it's currently operating from?

4        A.   No.

5        Q.   Tell me about that then.

6        A.   Sure.   The parent company, Planet Group,

7   Inc., leases the office building on 117th Street

8   and...

9        Q.   Does the parent corporation then charge rent

10   to the subsidiary, or do you know?

11        A.   It does not.   It has not the last few years.

12        Q.   Okay.

13        A.   There was a time seven or eight years ago

14   where the parent company allocated a lot of the

15   overhead across the different business units, and Tom

16   Nichting stopped that, I am guessing, five years ago.

17        Q.   Okay.   The schedules indicate there were

18   approximately $409,000 worth of accounts receivable

19   on the date of filing.   Have you collected those or

20   are they collectible?

21        A.   They are all collectible.   We have collected

22   most of that money.

23        Q.   Part ten of Schedule B talks about

24   intangibles and intellectual properties.   And just

25   without getting into a lot of detail, I just want to

*O'BRIEN - Examination*

1     know what these are and whether -- and basically

2     whether you think they have any value, the first one

3     being Acquire360?

4          A.   Acquire360 is the main software of the

5     business.  And, yes, it has a lot of value.

6          Q.   Do you have any estimate of what the value

7     might be, or is that difficult to determine?

8          A.   Difficult to determine.

9          Q.   The next one is E360.

10          A.   That is another software module that would

11     have less value than A360.  Also very difficult to

12     determine the value of that --

13          Q.   Okay.

14          A.   -- asset.

15          Q.   The next one is a transaction reject and

16     repair application.

17          A.   Yes.  That is a module that's used along

18     with the A360 product, transaction repair and

19     replace, and that would have far less value than

20     A360.

21          Q.   And then there's a balance reconciliation?

22          A.   Yes.  The same answer as for TRR.  The same

23     would be true for BR -- for balance reconciliation.

24          Q.   It's a module that you use with...

25          A.   It's a module used along with A360.

13

1          Q.   Okay.

2          A.   It's probably not of much value without

3     A360.

4          Q.   Schedule D asked for secured creditors.   Is

5     it correct that no creditor, to your knowledge, has a

6     security interest or a lien on any assets owned by

7     the debtor?

8          A.   Yes.   That's true.

9          Q.   Okay.   Are you aware of any tax obligations

10    that would be owed either to the IRS or a state

11    taxing authority?

12         A.   No.

13         Q.   On schedule of creditors, unsecured

14    creditors, Planet Correspondence Technologies,

15    Incorporated, which I believe is one of the entities

16    you indicated was owned by Planet Group, is listed as

17    being owed 152,000.   What was that for?

18         A.   I am not -- I don't know.

19         Q.   Okay.   What does Planet Correspondence

20    Technologies, Incorporated, do?

21         A.   It's a so- -- a provider of software for

22    what they call unified communications.   An example of

23    that software would be they have a customer, CIDC, a

24    large Canadian bank, and when that bank wants to

25    communicate with its customers, whether it be

*O'BRIEN - Examination*

1   depositors or loan customers or a trust company,

2   investment customers, the bank may want to

3   communicate with their customers via text, via fax,

4   via voice, via e-mail, through various channels, and

5   this is a software that helps the bank manage that

6   com- -- those communication channels to the

7   customers.

8        Q.  As a follow-up question to the employees, do

9   the employees that work for this -- for the debtor

10  entity, either as employee of the debtor or of Planet

11  Group, Incorporated, also provide services to these

12  other entities?

13       A.  None of the employees that are involved in

14  the operation of the debtor, none of them are

15  involved in -- in the other entities.

16       Q.  Okay.  Planet Group, Incorporated, is listed

17  as being owed in excess of $12 million.  Do you know

18  what that -- what that debt would be for?

19       A.  Yes.  Most of that is made up of

20  compensation related to the employees that work on

21  the debtor's business.  And so the way it would work

22  is -- the way it does work is that Planet Group pays

23  those employees through their payroll system and

24  provides benefits to them.

25            And then at the end of each month Planet

*O'BRIEN - Examination*

1    Group, the parent, bills, invoices the debtor for the

2    cost of those employees.  So that would be the

3    payroll plus benefits plus taxes, if paid, plus any

4    fringe-related costs.

5           There's no markup.  That would be more than

6    80 percent of the balance would be my guess, is more

7    than 80 percent of that $12 million relates to

8    compensation.

9       Q.  And do you -- do you believe that the debtor

10   will owe anything to the four customers as a result

11   of the rejection of the contracts?

12      A.  Um...

13      Q.  If you know.  I mean, if you don't know...

14      A.  I don't know.

15      Q.  Okay.  On question number six of the

16   statement of financial affairs requests gross

17   revenues from business.  In 2014 the revenue was

18   4.5 million.  In 2015 the revenue was 3.5 million.

19   Why was there a decrease in revenue of approximately

20   a million dollars --

21      A.  Um...

22      Q.  -- that year?

23      A.  My guess is it would have to do with what we

24   call custom work.  So the four customers request the

25   debtor to provide services to enhance the processing

*O'BRIEN - Examination*

1    capabilities around A360.  And so our employees will

2    provide custom development work for them and charge

3    them for that on an hourly or a fixed-bid basis.  And

4    that amount of that custom work fluctuates from year

5    to year.

6         Q.  Okay.

7         A.  Or it could also be one-time license sales.

8    So, for example, the TRR and the BR products are

9    newer products that may have been licensed very

10   recently, and, you know, they might have been

11   licensed for 300- or $500,000.

12        Q.  Okay.  And where's the bank account at for

13   Planet Merchant Processing?

14        A.  Well, today it's at Wells Fargo as a

15   debtor-in-possession account.

16        Q.  Oh, okay.  So that's a new account that

17   you've opened or will be opening?

18        A.  It is opened.

19        Q.  Okay.

20        A.  It's the only bank account at this time.

21        Q.  Okay.  Does the debtor have insurance

22   coverage on its assets?

23        A.  Yes.

24        Q.  Okay.

25        A.  The -- through the parent company --

*O'BRIEN - Examination*

1      Q.   Okay.

2      A.   -- the assets are insured.

3      Q.   Are you aware of the requirement to file

4  monthly operating reports with the bankruptcy court?

5      A.   Yes.

6      Q.   Okay.  Do you anticipate that the debtor

7  will need to borrow any money during the bankruptcy

8  proceeding?

9      A.   Yes.

10      Q.   Do you anticipate that the money would be

11  borrowed from the parent company or how would -- who

12  would be -- who do you anticipate borrowing money

13  from?

14      A.   That's the most likely source --

15      Q.   Okay.

16      A.   -- is the parent.

17      Q.   Has the parent loaned money to the -- to the

18  debtor as -- since the filing of the case?

19      A.   No.

20          TRUSTEE JENSEN:  That's all the questions I

21  have at this time.  Now I am going to give an

22  opportunity for creditors that are present to ask any

23  questions.

24          And, Mr. Grams, do you want to start?

25          MR. GRAMS:  I will.

*O'BRIEN - Examination*

```
 1              TRUSTEE JENSEN:  Okay.  Do you want to

 2   enter -- you need to state your name and who you

 3   represent.

 4              MR. GRAMS:  Sure.  I am Jason Grams.  I am

 5   here for First American Payment Systems.

 6                     EXAMINATION

 7   BY MR. GRAMS:

 8        Q.  I am going to refer to First American

 9   Payment Systems as FAPS probably.  If I refer to

10   Planet Merchant Processing it will be as PMP or

11   debtor, and the parent, Planet Group, Incorporated,

12   as PGI or parent.  Is that fair enough?

13        A.  Yes.

14        Q.  Okay.  Can you hear me okay?

15        A.  Yes.

16        Q.  All right.  Last night you filed an amended

17   declaration form two thousand -- or, 202.  I have got

18   that on the docket as docket 132.  It was filed

19   yesterday at 4:36.  Are you familiar with that?

20        A.  Yes, I am.

21        Q.  Okay.  And is that your signature at the

22   bottom of the first page?

23              MR. KING:  Well, he hasn't signed it.

24   That's not his signature, but...

25        Q.  (By Mr. Grams)  Is that your electronic
```

O'BRIEN - Examination

1    signature at the bottom of it?

2            MR. KING:  Yes.

3        A.  Yes.

4        Q.  (By Mr. Grams)  Okay.  And all of the

5    questions he asked you earlier about signing under

6    penalty of perjury and being familiar with the

7    contents, those apply to this document as well to

8    the -- as the other schedule?

9        A.  Okay.

10        Q.  Okay.  Well, is that -- is that correct?

11        A.  Ask the question again, and I'll answer.

12        Q.  Okay.  All of the -- all of the questions he

13    asked you about, the authenticity of the document and

14    your having signed it under penalty of perjury that

15    applied to the schedules that Jerry just asked you

16    about apply to this document as well as to that

17    document; is that correct?

18        A.  I don't know if that's correct.

19            MR. KING:  You're talking about the

20    original schedules?  We'll stipulate to that.

21            MR. GRAMS:  You will?

22            MR. KING:  Yeah.

23            MR. GRAMS:  Excellent.  Okay.

24        Q.  (By Mr. Grams)  I have just a few questions

25    about this.  On page three -- and it says page six at

*O'BRIEN - Examination*

```
 1    the bottom.  It's three of four at the top.

 2        A.  Got it.

 3        Q.  I just wanted to ask you about line 65.  The

 4    original schedule, I'll represent to you, didn't say

 5    anything for goodwill, and now the new schedule says

 6    "see attached."  Does that attachment refer to what's

 7    titled Amended Schedule B, which is the next page of

 8    this document?

 9        A.  That's -- Attachment B is up here on line

10    60.  It's goodwill.  I don't know.

11            MR. KING:  Yeah.

12            MR. GRAMS:  It does?

13            MR. KING:  Yep.

14            MR. GRAMS:  All right.  And -- and so I am

15    going to...

16            MR. KING:  And that's -- it's not goodwill.

17    It's just -- it's hard to fit in "see attached" in

18    the appropriate space.  So I think it would go in the

19    column above that, other intangibles or intellectual

20    property.

21            MR. GRAMS:  That's fine.  I just wanted to

22    make sure that's what you meant to do.

23            MR. KING:  Yep.  Yep.

24        Q.  (By Mr. Grams)  So -- okay.  So -- and I

25    want to look at the Amended Schedule B.  And this is
```

*O'BRIEN - Examination*

```
 1    page four of the document I just handed you, number

 2    132.  And I am going to have you read aloud the

 3    content of that paragraph, and I am going to ask you

 4    a series of questions about it.  If you could do

 5    that, just for the record.

 6         A.   Sure.  Amended Schedule B.  The debtor is

 7    also a party to seven subcontractor agreements, in

 8    quotes, agreements, with individuals who provide

 9    services to the debtor as independent contractors.

10    The services under these agreements have been

11    performed and were paid for by the debtor prior to

12    the bankruptcy.

13              The agreements automatically renew unless

14    terminated.  While the debtor may still retain the

15    services of the subcontractors under the agreements,

16    it is not obligated to do so.  The agreements provide

17    the debtor with certain rights, including, but not

18    limited to, ownership rights and products created by

19    the subcontractors in connection with the agreements.

20         Q.   Okay.  And so you refer to seven

21    subcontractor agreements.  Who were these agreements

22    with?

23         A.   Seven individuals.  I don't -- I don't have

24    their names.

25         Q.   People, though, not companies?
```

1          A.   I believe -- I've seen some of these.  So --

2     and the ones I saw were people.

3          Q.   Okay.

4          A.   Now, whether it's their entity or the person

5     themselves, the ones I saw all had people's names.

6          Q.   Do you know any of the people that were the

7     subcontractors listed here?

8          A.   I know some of the names.

9          Q.   Sure.  What are they?

10         A.   Seth Lockler [phonetic], and one other one

11    was -- I can't think of it.

12         Q.   Okay.  What services did these re- -- is it

13    proper to use "do" or "did" -- did these people

14    provide?

15         A.   Is it properties?  Did you...

16         Q.   Is it proper -- oh, what services were

17    provided under the subcontractor agreements?

18         A.   Yeah, I -- I don't know what they

19    specifically did or when they did it.

20         Q.   Okay.  Okay.  Are they still...

21         A.   My understanding is that in most of these

22    cases they were former employees.  And then when they

23    stopped working, they wanted to work -- continue

24    working for us under a contract basis for some period

25    of time.

*O'BRIEN - Examination*

```
 1          Q.  And you don't -- you said you don't know
 2    what they did.  Do you know what type of thing they
 3    did?  Were these programmers, or what sort of
 4    employees were they?
 5          A.  Yeah, I don't know.
 6          Q.  Okay.  Are the contracts active now?
 7          A.  My understanding is that they are, with the
 8    exception of Seth Lockler, who sent a termination
 9    notice to the debtor.
10          Q.  Are these seven individuals part of the 25
11    employees you're claiming are employees of the
12    debtor?
13          A.  No.
14          Q.  So these people would be in addition to the
15    25?
16          A.  Yes.
17          Q.  The services under the agreements have been
18    performed and were paid for by debtor prior to the
19    bankruptcy.  Are they still being performed in any
20    case?
21          A.  No.
22          Q.  And when it says the services -- or the
23    debtor may still retain the services of the
24    subcontractors, that would apply to everybody but
25    Mr. Lockler?
```

*O'BRIEN - Examination*

1          A.   Ask the question one more time.

2          Q.   When the -- the schedule says, while the

3     debtor may still retain the services of the

4     subcontractors under the agreements --

5          A.   Yeah.

6          Q.   -- that would apply to everybody but

7     Mr. Lockler?

8               MR. KING:   Form and foundation.   You can go

9     ahead and answer if you know.

10         A.   I believe it applies -- that -- yes.   The --

11    it applies to all of them.   And I don't know the

12    legal status of the termination notice, so I don't

13    know if it applies to Seth or not.

14         Q.   (By Mr. Grams)   Okay.   The agreements

15    provide the debtor with certain rights.   What rights

16    are you referring to here?

17         A.   Generally confidentiality rights,

18    noncompete, slash, nonsolicitation rights.

19         Q.   And it says ownership rights in the products

20    created?

21         A.   That's what it says.

22         Q.   Is it fair to assume from the language here

23    that these individuals were involved in the creation

24    of products?

25         A.   You could draw that conclusion.

*O'BRIEN - Examination*

```
 1          Q.   Okay.   When were these agreements signed?

 2          A.   I don't know.

 3          Q.   Were they all signed prior to the filing of

 4     the bankruptcy?

 5          A.   Yes.

 6          Q.   I am going to ask this.   I think you've

 7     already answered it, but are you still using any of

 8     these subcontractors?

 9          A.   No.

10          Q.   What's the plan for continuing operations

11     for the debtor?

12          A.   The plan right now is to continue to develop

13     the software, maintain it in current -- current

14     condition, and to continue doing that until we've

15     determined whether or not we can renegotiate

16     contracts with the four former customers.

17          Q.   Does the debtor have any income at this

18     point?

19          A.   No.

20          Q.   And what about expenses?

21          A.   Yes.

22          Q.   Are they similar to what the expenses were

23     prior to the termina- -- or, the rejection of the

24     contracts with the customers?

25          A.   I believe they are.
```

*O'BRIEN - Examination*

1      Q.   Okay.  If you're unable to make agreements

2  with the customers, what's the plan to turn the

3  company around and make money?

4      A.   Well, the plan, if we -- if we can't

5  renegotiate contracts, the plan will be to go back to

6  the parent company and make them aware that we don't

7  have a need for 25 employees.  We would have to

8  skinny it down quite a bit, with the goal being at

9  that point to sell the company with a core set of

10  employees to support the software.

11      And so the plan would be if there is no

12  new -- if there are no new contracts, we need to

13  lower the cash burn so that it gives us enough

14  runway, enough time to run an orderly sale process.

15      Q.   Okay.  And I don't want to put words in your

16  mouth, but it's -- it -- you have -- it's kind of a

17  two-prong plan?

18      A.   Yes.

19      Q.   Renegotiate or sell?

20      A.   Yes.

21      Q.   There is no plan for continuing operations

22  except in one of those two buckets; is that correct?

23      A.   Yes.

24      Q.   Okay.  There was some mention in the -- one

25  of the earlier hearings about plans to redo the

*O'BRIEN - Examination*

1  software?

2     A.  I am not familiar with redo the software.

3     Q.  Okay.  So there is no -- I guess I'll put it

4  this way.  Are there any upgrades planned beyond what

5  you would have done in the ordinary course of

6  upgrading the software when you were operating under

7  the customer agreements?

8        MR. KING:  Form.  Answer if you can

9  understand.

10    A.  So when we had the customers, we were

11 servicing the customers, we spent a lot of time

12 working on operational issues related to the so- --

13 customers as well as custom development related to

14 the customer requests.

15      And the current plan is to work on all of

16 the things that we didn't get a chance to work on

17 because we were too busy working on customer

18 requests.  And so we have dozens and dozens and

19 dozens of items that we would like to do to this

20 software, but we just have never gotten to it because

21 we didn't have the time and resources to get it done.

22      So in terms of work to be done on that

23 software, there's more work than we'll ever be able

24 to get done.  We're going to run out of money

25 probably long before we'll get to the bottom of that

*O'BRIEN - Examination*

1    list.

2         Q.   (By Mr. Grams)   Now, what are some examples

3    of things that are on that list?

4         A.   I don't have any examples for you.

5         Q.   During the TRO period, the customers

6    provided funds to continue the operation of the

7    business; is that right?

8              MR. KING:   Form.   Foundation.

9         A.   Yes.

10        Q.   (By Mr. Grams)   Okay.   Was any development

11   done during that period of time?

12             MR. KING:   Same.

13        A.   Um...

14        Q.   (By Mr. Grams)   And by "development," I mean

15   any modifications made to the software.

16        A.   Modifications.   No modifications were made

17   to the software, but the team worked on functionality

18   of the software.   So there is work out there that

19   they're working on.

20        Q.   Uh-huh.

21        A.   But they never put it into the software.

22   They're still working on stuff.   So they haven't put

23   anything into the software since August 16th.

24        Q.   And they're -- they're the -- something

25   called the fall release, could you -- are you

*O'BRIEN - Examination*

1    familiar with that term?

2         A.   Yes.

3         Q.   Could you tell me what that means?

4         A.   Yes.   The card associations released new or

5    additional rules.   And in order for our software to

6    run optimally, our software has to be in compliance

7    with the rules of these card associations.   So when

8    these new rules or additional rules come out, we

9    modify our software to reflect and comply with those

10   new rules and additional rules.

11        Q.   And is the fall release what the employees

12   were working on during the TRO period?

13             MR. KING:   Foundation.

14        A.   That is some of the stuff they were working

15   on during that --

16        Q.   (By Mr. Grams)   Have they completed --

17        A.   -- TRO period.

18        Q.   -- the fall release?

19        A.   To my knowledge, no.

20        Q.   What portions of the fall release have been

21   completed?

22        A.   I don't know.

23        Q.   What portions have not been completed?

24        A.   I don't know.

25        Q.   Is it complete except for applying it to the

1    software?

2         A.  No.

3         Q.  Where does the code for the fall release

4    reside?

5         A.  I don't know.

6         Q.  Is it with the debtor or the parent?

7         A.  The debtor always holds that software, not

8    the parent.

9         Q.  Does the parent have any rights to the fall

10   release code?

11            MR. KING:   Foundation.

12        A.  I don't know.

13        Q.  (By Mr. Grams)  Is the fall release code an

14   asset that you're amortizing on the schedule?

15        A.  Is the fall release code on the schedules?

16        Q.  Is it referred to on the schedules?

17        A.  No.

18        Q.  Are you working on the April release?

19        A.  No.

20        Q.  Do you plan to work on the April release?

21        A.  Yes.

22        Q.  Do you plan to work on the April release if

23   the contracts remain rejected?

24        A.  Yes.

25        Q.  How does PMP plan to do that without access

O'BRIEN - Examination

```
 1    to the regulations from the customers?

 2         A.  I don't know.

 3         Q.  Is it PMP's -- if it's unable to sell and

 4    it's unable to renew the contract, is it PMP's intent

 5    to just go out of business?

 6         A.  No.  We think -- we think we will -- we have

 7    no doubt we'll be able to sell it to somebody at some

 8    price.

 9         Q.  Okay.  Let's talk about that.  The -- so the

10    principal assets you've testified were -- are the

11    ass- -- are the software and the access to PGI's

12    employees; yes?

13         A.  Yes.

14         Q.  Okay.  And has there been any attempt to

15    sell just the software?

16         A.  I don't think so.

17         Q.  Okay.  Is there a plan to -- was there a

18    plan to sell the company?

19         A.  Yes.

20         Q.  And the value that you were intending to

21    sell it for?

22         A.  Whatever the highest bidder would bid.  And

23    if it was acceptable to us, that would be the number.

24    But I don't have a number.

25         Q.  Where does the -- so I have heard the figure
```

*O'BRIEN - Examination*

```
1       $48 million mentioned.  Where does that figure come

2    from?

3          A.   That came from the board of PMP.

4          Q.   Okay.  And what made -- what is the board

5    basing its $48 million figure on?

6          A.   Its perception of the value of that

7    software.

8          Q.   Okay.

9          A.   The business.

10         Q.   And what is that based on?

11         A.   It's based on the uniqueness of the software

12   itself, the efficiency of its interchange

13   qualification engine.  It's based on the value of

14   that unique software in combination with the

15   employees who have the knowledge base to maintain and

16   enhance that software.

17         Q.   So the -- the sales plan is -- has always

18   included the 25 employees that are assigned to the

19   debtor?

20         A.   Yes.

21         Q.   Okay.  And you went through a sales process?

22         A.   Yes.

23         Q.   When was that?

24         A.   It kicked off in January of 2016.

25         Q.   Okay.  And it was with -- Raymond James
```

*O'BRIEN - Examination*

```
 1      listed it for you or solicited bids for you?

 2           A.  Yes.

 3           Q.  Okay.  I don't want to put words in your

 4      mouth.  What -- you were hesitant there.  What did

 5      Raymond James do for you?

 6           A.  I don't think they listed it.

 7           Q.  Okay.

 8           A.  I don't -- what did they do.  So they

 9      identified potential buyers of the business.  They

10      reviewed the records of the company.  They created a

11      teaser they used to go out and approach the 104

12      prospects they identified.

13           Q.  A teaser is a presentation or a -- a piece

14      of mail?  What is a teaser?

15           A.  A teaser is typically -- in the investment

16      banking world is a one- or two-page summary of the

17      business and the opportunity to either buy it or

18      joint venture it, whatever the opportunity is.

19           Q.  Okay.  So they created that?

20           A.  It's to get somebody interested.  And then

21      if you can get them interested through the teaser,

22      the next step is to get them to sign an NDA,

23      nondisclosure agreement.  And once they sign an NDA,

24      then Raymond James would send them a confidential

25      offering memorandum.
```

O'BRIEN - Examination

1      Q.   Okay.  So let's go through that one at a

2    time.  You said there were 102 teaser letters sent

3    out?

4      A.   104.

5      Q.   104?  How many of those resulted in an

6    indication of interest that signed an NDA?

7      A.   So not an indication of interest, but signed

8    an NDA?

9      Q.   Yeah.

10      A.   I am going to say approximately 30.

11      Q.   And then let's back up.  It sounds like

12    there's a step there indicating interest that is

13    between -- or it's -- precedes the signing an NDA.

14    Did anybody indicate interest and yet not sign an

15    NDA?

16           MR. KING:  Can you say that again?

17      Q.   (By Mr. Grams)  Yeah.

18      A.   I don't understand that.

19      Q.   So you sent out 104 teasers.  Thirty people

20    signed an NDA.  Was there anybody that responded to

21    the teaser that did not sign an NDA?

22      A.   I don't know.

23           MR. KING:  Foundation.  You can answer.

24      Q.   (By Mr. Grams)  Of those that signed an

25    NDA -- well, what's the next step after the NDA?

*O'BRIEN - Examination*

1        A.  After the NDA, Raymond James would send them

2    a confidential offering memorandum.

3        Q.  Okay.

4        A.  And then Raymond James would ask for

5    indications of interest by a certain date.

6        Q.  Okay.

7        A.  Do you want to go from start all the way to

8    the end?

9        Q.  Well, yeah.  Let's take them one at a time.

10       A.  Okay.  Sure.

11       Q.  So how many people did send back an

12   indication of interest?

13       A.  Three.

14       Q.  All right.  And what was the next step?

15       A.  The next step is, number one, to continue

16   working on the others who haven't given you an

17   indication of interest, but that's kind of a

18   background going on.

19       Q.  Sure.

20       A.  But with respect to the three that indicated

21   interest, an interest, one was declined, was rejected

22   by the debtor.  The other two were allowed mana- --

23   into the due diligence room, basically an electronic

24   room where the records are kept.

25       Q.  Okay.

*O'BRIEN - Examination*

```
 1          A.  And given time to spend with the management
 2     to discuss the business.
 3          Q.  Who was the rejected one?
 4              MR. KING:  I am going to object on the
 5     grounds of confidentiality.  We have a
 6     confidentiality agreement, I think, with these people
 7     that expressed interest.  And that was the subject of
 8     our -- I think we raised in conjunction with the
 9     protective order we've previously proposed.  So I
10     would object to the disclosure of that information.
11              MR. GRAMS:  We can table that, and I can
12     get it from you later.
13              MR. KING:  Okay.
14          Q.  (By Mr. Grams)  Why did you reject this
15     party?
16          A.  Price.
17          Q.  And how much did they offer?
18              MR. KING:  Same objection.
19     Confidentiality.  That's part of what we think is
20     confidential.
21              MR. GRAMS:  All right.  I mean, I disagree
22     with you.  We're not identifying the party.  We're
23     identifying the amount that he's proposing to offer
24     the debtor.  Are you instructing him not to answer?
25              MR. KING:  Yeah.  Yeah.
```

*O'BRIEN - Examination*

```
 1              MR. GRAMS:  All right.

 2       Q.  (By Mr. Grams)  Okay.  The ones that did due

 3  diligence, they must have made an offer at that time

 4  that the debtor decided to proceed with to due

 5  diligence; is that correct?

 6              MR. KING:  Form.

 7       Q.  (By Mr. Grams)  You can answer.

 8       A.  The PMP proceeded with two parties that

 9  provided an indication of interest to allow them to

10  do due diligence and meet with management.

11       Q.  And who were those parties?

12              MR. KING:  Same objection.  Confidential.

13              MR. GRAMS:  Same instruction?

14              MR. KING:  Yes.

15       Q.  (By Mr. Grams)  And who -- how much did

16  those parties offer?

17              MR. KING:  Same ob- -- same objection.

18  Same instruction.

19       Q.  (By Mr. Grams)  There were three offers,

20  though, to buy the business, or three bids?

21       A.  In- -- there were three indications of

22  interest.

23       Q.  And those indications of interest provided

24  an amount they were interested in paying?

25       A.  Sometimes they provided an amount.
```

*O'BRIEN - Examination*

1    Sometimes they provided a range.

2         Q.  And did PGI reject all of the offers?

3              MR. KING:   Form.

4         A.  Are you referring to PMP?

5         Q.  (By Mr. Grams)  Well, PGI owned the debtor;

6    correct?

7         A.  Correct.

8         Q.  And these were offers to buy the debtor.  So

9    would -- am I wrong to say that it would be PGI that

10   chose to accept or reject the offers to buy the

11   debtor?

12        A.  It was discussed at both levels.  Your

13   question is...

14        Q.  Did PGI reject the offers to buy the debtor?

15        A.  Reject the offers?

16             MR. KING:   Form.  I don't know that he said

17   there were offers to buy the debtor.

18        A.  There were indications of interest.

19        Q.  (By Mr. Grams)  Okay.  Did PGI reject the

20   indications of interest to buy the debtors?

21        A.  In one instance, yes.

22        Q.  And what about in the other two?

23        A.  No.

24        Q.  What happened in those situations?

25        A.  In those situations the -- both of those

*O'BRIEN - Examination*

```
 1    parties continued to the due diligence phase and the

 2    management meetings.  And after that phase, then you

 3    have a call for actual offers.

 4         Q.  Okay.

 5         A.  And there were no offers submitted.

 6         Q.  Okay.

 7              MR. GRAMS:  Some of this has been covered

 8    in the main schedule here, which is filing 103, which

 9    is -- I am sure you have one, Sam, if you...

10              MR. KING:  I do, yeah.

11         Q.  (By Mr. Grams)  Just a few questions on

12    this.  And I think some of these have been covered

13    already, so I am going to go through Planet

14    Correspond- -- and I am on page 16 of 34, if you look

15    at the top.

16              But on your creditors with nonpriority

17    secured claims, you were asked about the 152,814 to

18    Planet Correspondence Technologies.  And I believe

19    your testimony was you -- you didn't know what that

20    was for, but it says money loaned.

21              Would that have been in the form of a -- of

22    a check that Planet Correspondence Technologies sent

23    to the debtor?

24         A.  I don't know.

25         Q.  Okay.  And is that -- with respect to the
```

*O'BRIEN - Examination*

1      $12,012,372 for Planet Group, Inc., it also says

2      money loaned.  You described a situation where you

3      were -- where the parent was sending the debtor

4      invoices?

5          A.  Yes.

6          Q.  And the debtor was either -- well, describe

7      how that 12 thou- -- or, $12 million plus has

8      accumulated.

9          A.  Okay.  So each month Planet Group would send

10     an invoice to PMP saying, hey, you owe for the

11     compensation of these employees.  And there could be

12     other issue -- other -- there could be other things

13     besides just compensation.  It could be for some

14     office supplies that the parent paid for on behalf of

15     the subsidiary.

16              But by and large it's mostly compensation.

17     And that is the bulk of the $12 million balance.

18     Now, if the subsidiary ran out of money and the

19     parent had to advance funding, I am guessing there

20     could be some of that in this balance, but I am not

21     sure about that.

22         Q.  All right.  Is there documentation

23     supporting all of these $12 million?

24         A.  Yes.  They've been provided to all of the

25     customers.

*O'BRIEN - Examination*

1          Q.  And is that the schedule that -- the chart

2     of accounts that we received?

3              MR. KING:  Yeah.  I think there was that.

4     There was about 300 pages of the schedule of

5     accounts, invoices and things like that.

6          A.  Yes.

7          Q.  (By Mr. Grams)  Okay.

8          A.  Each...

9          Q.  And I have...

10         A.  Each invoice.

11         Q.  And I haven't summed those up, but if I sum

12    those up it will equal $12,012,372?

13         A.  I don't know.

14         Q.  Okay.

15             MR. KING:  I think that's accurate.

16         Q.  (By Mr. Grams)  All right.  You were asked

17    about the facility.  There is no allocation of lease

18    in that $12 million?

19         A.  Not in the last five years.  There could

20    have been prior to that.

21         Q.  And would that be included in this figure

22    that's owed to the parent?

23         A.  Yes.

24         Q.  Okay.  And you said 80 percent of it was

25    employees.  Will -- I want to get to that in a

O'BRIEN - Examination

```
 1   minute.  But were there any management fees?

 2        A.  No.

 3        Q.  So there would -- in that $12 million there

 4   are no payments to PGI or West Partners or anything

 5   like that for managing the companies?

 6        A.  There were no payments to West Partners

 7   ever.  When the Planet Group was doing corporate

 8   allocations years and years ago and they would

 9   allocate rent to various subsid- -- business units --

10        Q.  Uh-huh.

11        A.  -- there could have been an allocation of

12   the CEO and the CFO's compensation across the units,

13   but I don't know about that.

14        Q.  Why did Planet Group stop doing the

15   allocations?

16        A.  Because the new CEO, Tom Nichting, didn't

17   like that process.

18        Q.  Okay.  Do you know why Tom didn't like it?

19        A.  No.

20        Q.  We'd have to ask him?

21        A.  Yes.

22        Q.  How do we get ahold of Tom?

23        A.  Call him.

24        Q.  Okay.  We'd reach him through counsel?  Does

25   he still work for PMP?
```

O'BRIEN - Examination

```
1           A.  He works for Planet Group, Inc.

2           Q.  Okay.  So I could reach him through

3     Mr. King?

4               MR. KING:  Well, I think you'd have to talk

5     to Planet Group because he's an employee of Planet

6     Group.  Right?

7               THE WITNESS:  Yeah.

8               MR. GRAMS:  Okay.

9               MR. KING:  So talk to their counsel.

10          Q.  (By Mr. Grams)  What documents show that

11    PGI's investment in PMP was debt financing as opposed

12    to equity financing?

13          A.  Ask the question one more time.

14          Q.  Okay.  What documents show that PGI's

15    investment in PMP was debt financing as opposed to

16    equity financing?

17          A.  A document?  I think that that...

18              MR. KING:  Form and foundation.  Go ahead.

19          A.  The balance sheet.

20          Q.  (By Mr. Grams)  Are there any written

21    agreements between PMP and PGI?

22          A.  Any?

23          Q.  Any.

24          A.  Not that I am aware of.

25          Q.  You said there was no lease.  Are there any
```

44

1    notes for loans?

2         A.   Between the parent and the subsidary?

3         Q.   Correct.

4         A.   Not that I am aware of.

5         Q.   Is there any agreement to let PMP use PGI's

6    employees?

7         A.   What do you mean by "agreement"?

8         Q.   Is there a written agreement?

9         A.   No.

10        Q.   Is there an oral agreement?

11            MR. KING:   Form.

12        Q.   (By Mr. Grams)  I think I see the problem.

13   Is there an understanding between PMP and PGI that

14   takes the form of a contract that allows PMP to use

15   PGI's employees?

16        A.   There is an un-...

17            MR. KING:   Object to form and foundation.

18   It's because I think it calls for a legal conclusion,

19   but go ahead and answer to the extent you can.

20        A.   Okay.   There is an understanding between the

21   two entities, as you described, but whether or not it

22   forms a contract or not, I don't know.

23        Q.   (By Mr. Grams)  Well, describe the

24   understanding for me.

25        A.   PMP needs employees to provide the services

O'BRIEN - Examination

1    they provide and build the software they build.  And

2    the parent company has a 401K plan and a payroll

3    system and major medical, all the things you would

4    see in a typical employment environment.

5         And rather than replicate that at five --

6    for four or five entities, it's done at one entity.

7    And so the understanding is those employees do

8    work -- the PMP employees work on PMP business.  And

9    the fact that they're employed by the parent, it's a

10   convenient way to do it, and it's an economical way

11   to do it.

12        And so the understanding is that they'll be

13   employed by the parent, but they'll basically work in

14   the business unit under the direction of the business

15   unit and the co- -- from an economic standpoint it's

16   a cost pass-through with no markup.

17        Q.  And I heard that there's no markup.  You're

18   not billing PMP more than the -- than you paid the

19   employees to do the work or to be employed there?

20        MR. KING:  Object to form as to "billing."

21   Go ahead and answer.

22        Q.  (By Mr. Grams)  Well...

23        A.  Correct.

24        Q.  Okay.  Does PGI have any obligation to allow

25   PMP to transfer its employees if PMP is sold?

*O'BRIEN - Examination*

1          A.   Does...

2               MR. KING:   Foundation.

3          A.   You're asking if the parent has -- has what?

4          Q.   (By Mr. Grams)   Any obligation to transfer

5     the employees that work for PMP to a buyer if PGI --

6     or, if PMP is sold.

7               MR. KING:   Foundation.

8          A.   I don't know if they have an obligation.

9          Q.   (By Mr. Grams)   Are there any shared

10    employees between PGI and PMP?

11              MR. KING:   Form.

12         A.   Did you say shared employees?

13         Q.   (By Mr. Grams)   I said shared employees.

14         A.   Okay.

15         Q.   I can be more clear, if it's helpful.

16         A.   Yes.

17         Q.   Are there any employees that work for

18    more -- or, that do work for more than just PMP?

19         A.   The CEO of PM- -- the CEO of the parent

20    works on all of the business units.

21         Q.   Who is that?

22         A.   Tom Nichting.

23         Q.   Okay.   Is he the only one?

24         A.   Amber Blohm is in-house counsel.  She works

25    for Planet Group, Inc., and she works on the business

O'BRIEN - Examination

```
 1   of all of the business units.

 2        Q.  Okay.

 3        A.  There was a controller who was employed by

 4   Planet Group, Inc., and worked on the financial

 5   reporting of Planet Group, Inc., as well as the other

 6   operating business units.  In the -- in the past,

 7   going back probably a couple of years, there was a VP

 8   of sales who worked at Planet -- worked -- was

 9   employed by Planet Group, and he worked on more than

10   one business unit.  And there was a marketing person

11   in the past, and she was employed by Planet Group,

12   and she worked on more than one business unit.  That

13   is the extent of shared employees as far as I can

14   tell.

15        Q.  Do you have a CIO?

16        A.  Not at the holding company.  Not at Planet

17   Group.

18        Q.  Who does that person work for?

19        A.  There is no C...

20        Q.  Is there a -- well, what's her name?

21   Sherry?

22        A.  Sherry Magwire.

23        Q.  What does Sherry Magwire do?

24        A.  She is the chief technology officer for PMP.

25        Q.  She is not a PGI employ- -- or, person?
```

O'BRIEN - Examination

1        A.  I don't view her as one.

2        Q.  Okay.

3        A.  She doesn't work on any of the other

4    business units.

5        Q.  So she's an employee of PGI, but her job is

6    to be the chief technology officer of PMP and not the

7    other units; is that correct?

8            MR. KING:  Foundation.  Foundation with

9    respect to "employee," but go ahead.

10       A.  That's correct.

11       Q.  (By Mr. Grams)  Okay.  Now, these people

12   that have functions that are involved in more than

13   one unit --

14       A.  Okay.

15       Q.  -- and by "these people" I refer to the ones

16   you just mentioned, the CEO, controller, VP of sales,

17   et cetera --

18       A.  Yes.

19       Q.  -- are their salaries allocated to the

20   various business units?

21       A.  No.  They have not been in the past five

22   years, since Tom Nichting stopped all allocations

23   going across the business units, but prior to that

24   they could have been.

25       Q.  And Ms. Magwire, she is allocated

O'BRIEN - Examination

```
 1      100 percent to PMP?

 2           A.   That's my understanding.

 3           Q.   Okay.  With re- -- is she one of the 25

 4      employees of the people you referred to as employees

 5      of PMP?

 6           A.   Yes.

 7           Q.   Okay.  Name as many as you can of the other

 8      people that are working for PMP.

 9           A.   Do I have to do that?

10           MR. KING:  Yeah, I'd object on the grounds

11      of confidentiality relating to that.  You know,

12      that's been a subject of dispute between the parties

13      because we've had issues relating to solicitation of

14      employees.  So we don't want to get into that and

15      disclose those names at this point.

16           MR. GRAMS:  Well, I am going to insist.

17      Are you instructing him not to answer?

18           MR. KING:  What do you need to know that

19      information for?

20           MR. GRAMS:  Well, I am going to ask him

21      some questions about each one of these people related

22      to the allocation of their work among the business

23      units and also what their job titles are and what

24      their functions are.

25           MR. KING:  Well, I think you can do that
```

*O'BRIEN - Examination*

1    without getting their names.  He can tell you the

2    individuals that are working on Planet Merchant

3    Processing, but...

4         MR. GRAMS:  Yeah, but I like doing it this

5    way.  So I am -- I am going to ask the question.  Are

6    you instructing him not to answer?  I don't think you

7    have a right to do that.

8         MR. KING:  I am instructing him not to

9    answer or provide information relating to the

10   identity of the employees, the names.

11        Q.  (By Mr. Grams)  All right.  Let's move

12   forward with the job titles.  What are the job titles

13   of the PGI employees that perform functions for PMP?

14        A.  Are you talking about the 25 people that

15   work in PMP?

16        Q.  Yes, unless the -- my question happened to

17   be broader than that --

18        A.  Ask the question again.

19        Q.  -- if there's more than the 25.

20        A.  I am just trying to understand the question,

21   so ask it again.

22        Q.  Yeah.  No, if there's more than that, that's

23   fine, but I think we understand each other.  What are

24   the job titles of the 25?

25        A.  I don't know.

*O'BRIEN - Examination*

```
 1          Q.  Well, you just testified that Sherry

 2     Magwire's the -- her job title is chief technology

 3     officer?

 4          A.  Correct.

 5          Q.  That's one.  Are there any others?

 6          A.  I don't -- I don't know what they are.

 7          Q.  Okay.  What do those people do?

 8          A.  They develop software.

 9          Q.  Okay.

10          A.  And they assist customers with running

11     cycles, nightly cycles.

12          Q.  And what's a nightly cycle?

13          A.  A nightly cycle is when transactions get

14     processed at the merchant level, they go to the

15     processor, which would be our customer.  And our

16     customer uses our software that they have licensed

17     from us to process those transactions.

18               And batches of those transactions are sent

19     through a system so that they can go to the card

20     associations as well as the card issuers to settle

21     funds.  And each time you send batch -- a batch

22     through, you're running a cycle.  Okay?

23          Q.  Okay.  Are those services that you provide

24     for all four of the customers?

25          A.  No.
```

*O'BRIEN - Examination*

1          Q.   Is it just for TransFirst?

2          A.   No.

3          Q.   Who do you provide those services for or did

4    you provide those services for prior to the

5    rejection?

6          A.   TransFirst and Worldpay.

7          Q.   Okay.  And how many of the employees are

8    involved in -- I am going to call those nightly

9    clearing operations?

10         A.   Yeah.  More than five, but less than ten.

11         Q.   Okay.  And how many -- I am going to try and

12   draw a distinction between people involved in

13   operating the software and people involved in

14   developing the software.

15         A.   We'll call them operators and developers.

16         Q.   Excellent.  How many -- how many operators

17   are there among the 25?

18         A.   More than five, less than ten.

19         Q.   And how many developers?

20         A.   That would be less than 20, more than 15.

21         Q.   Okay.  Now, I understand you're the

22   corporate representative.  You haven't been involved

23   in operations.  Who would be able to answer these

24   types of questions with more precision?

25         A.   Sherry Magwire.

*O'BRIEN - Examination*

```
 1          Q.  Okay.  Are there any other categories
 2     besides the chief technology officer, the operators
 3     and the developers that work -- or, that do work in
 4     Planet Merchant Processing?
 5          A.  Not that I am aware of.
 6          Q.  So that would encompass the whole 25?
 7          A.  Yes.
 8          Q.  Okay.  Are any of these operators,
 9     developers, or the chief technology officer subject
10     to an allocation of their salary -- or, salary
11     between more than one business unit?
12          A.  No.
13          Q.  So all 25 spend 100 percent of their time
14     working for -- or, performing services for Planet
15     Merchant Processing?
16          A.  Yes.  That's my understanding.
17          Q.  Okay.  What about your time?  Are you
18     allocated as a -- as a Planet Merchant Processing
19     individual?
20          A.  Am I allocated?
21          Q.  Yeah.  You're the president...
22              MR. KING:  As to compensation?
23              MR. GRAMS:  Yes.
24              MR. KING:  Okay.
25          A.  No.
```

*O'BRIEN - Examination*

1          Q.   (By Mr. Grams)   Okay.   And you're not

2     included in the 25?

3          A.   Correct.

4          Q.   When was -- when did you first start

5     discussing going into bankruptcy?

6               MR. KING:   Jason, it seems like we've been

7     going for quite a while on this, and we've got other

8     questions, other people that want to ask questions.

9     I mean, if you guys want to do a 2004 examination,

10    we'd be agreeable to that.   But, you know, how

11    much -- I mean, it seems like we're getting into

12    issues that may not relate to the bankruptcy.

13              MR. GRAMS:   I am getting towards the end.

14    I do think that these issues relate to the

15    bankruptcy.   So...

16              MR. KING:   As to why -- when they...

17              MR. GRAMS:   Well, I am not going to -- I am

18    not going to engage with you on why I think they do.

19    Are you instructing him not to answer?   I have got a

20    little bit more time left here.

21              MR. KING:   Yeah.   Go ahead.

22         Q.   (By Mr. Grams)   Okay.   When did you first

23    start discussing filing for bankruptcy?

24         A.   The earliest I can recall is April of 2016.

25         Q.   And whose idea was it?

O'BRIEN - Examination

1       A.   Mine.

2       Q.   And what was -- well, strike that.

3            All right.  I am just going to ask you a

4  couple more questions here.

5       A.   Okay.

6       Q.   On page 12 of 103, which is the thick one --

7       A.   Twelve of 34?

8       Q.   -- this is headed part seven, office

9  furniture, fixtures and equipment.  There's computer

10 equipment, fixtures, furniture and fixtures,

11 software.  Do you see that?

12      A.   Yeah.

13      Q.   So under software, and line 67 says

14 software, you've got a book cost of 954,398.68.  What

15 does that software refer to?

16      A.   I am guessing that that's a couple of

17 things.  First, it would -- my understanding is that

18 it includes some software that we have purchased to

19 run our computers and run our operations.

20      Q.   Okay.

21      A.   And there may be, in addition to that, some

22 capitalized software costs related to the development

23 of A360 for other software products developed by the

24 debtor.

25      Q.   As you sit here today, you don't know if

*O'BRIEN - Examination*

```
 1    that's the case or not?

 2         A.  Don't know.

 3         Q.  So it's got -- there are some -- there is

 4    some third-party software in there and there may be

 5    some software you developed?

 6         A.  Capitalized, yep.

 7         Q.  Does Micro Focus COBOL mean anything to you?

 8         A.  A little bit.

 9         Q.  Okay.  Is that a piece of software that

10    might be included in this figure here?

11         A.  I don't know.

12         Q.  Okay.  What about Celerity Unikix?  And I'll

13    spell it.  U-n-i-k-i-x.

14         A.  I don't know.

15         Q.  Okay.  But you're -- you're declaring

16    this -- these software values as assets of PMP; is

17    that correct?

18         A.  Yes.

19         Q.  So it's PMP's position -- if those two

20    pieces of software are included in this number, it's

21    PMP's position that PMP owns those licenses; is that

22    correct?

23         A.  Yes.

24              MR. GRAMS:  Okay.  I'd turn it over to

25    other counsel.
```

*O'BRIEN - Examination*

```
 1              TRUSTEE JENSEN:  Thank you.  And,

 2    Mr. Wright, would you like to enter your appearance?

 3              MR. WRIGHT:   Randy Wright on behalf of EVO

 4    Merchant Services.

 5                         EXAMINATION

 6    BY MR. WRIGHT:

 7         Q.   Mr. O'Brien, when did Mr. Nichting -- by the

 8    way, how do you spell Nichting?

 9         A.   N-i-c-h-t-i-n-g.

10         Q.   When did he resign as president of the

11    debtor?

12         A.   I assume the same day that I became

13    president.  So it was August 10th or 12th, right in

14    there.

15         Q.   Okay.  And did he have a conversation with

16    you about resignation?

17         A.   Yes.

18         Q.   Okay.  Tell me about that conversation.

19    What was said?

20         A.   I initiated the conversation and said, Tom,

21    if we put this into bankruptcy, is that going to be a

22    problem for you?  And he said, I'd prefer not to be

23    associated with the bankruptcy.  And I said, well, I

24    am happy to step in and take on the role of president

25    if we go into bankruptcy.
```

*O'BRIEN - Examination*

1       Q.   Was there more to the conversation than what

2    you just related?

3       A.   No.

4       Q.   So I take it the bankruptcy had been

5    discussed with -- between you and Mr. Nichting

6    earlier so he understood some context of what you

7    were talking about?

8       A.   Earlier than August 10th?  Yes.  Yes.

9       Q.   How much earlier?

10      A.   It would have been in -- I am guessing.  Is

11   that okay to guess?

12           MR. KING:  I'd prefer you not speculate,

13   but...

14      Q.   (By Mr. Wright)  Estimation is better than a

15   guess.

16      A.   I don't -- I'd estimate it was June or July.

17      Q.   And did -- in those discussions did he voice

18   opposition to a bankruptcy filing by PMP?

19      A.   No.  Did I object?  Is that what you're

20   asking?

21      Q.   Just -- no.  Did Mr. Nichting voice any

22   opposition to a bankruptcy filing by PMP?

23      A.   I don't recall any objection.

24      Q.   When were the -- were those conversations

25   with Mr. Nichting in the -- in the presence of others

O'BRIEN - Examination

```
 1    besides yourself?

 2         A.   I don't recall.

 3         Q.   Was this at a board meeting?

 4         A.   The conversation I just described to you was

 5    Tom and I in his office.

 6         Q.   But...

 7         A.   It was not in a board meeting.

 8         Q.   And that was in -- the conversation I am

 9    talking about is in June or July when there was a

10    discussion about a bankruptcy?

11         A.   Yeah, I don't know.

12         Q.   You don't recall?

13         A.   I -- I don't know.

14         Q.   So what -- other than employee salaries,

15    what liabilities is the debtor incurring now post

16    rejection of the contracts?

17         A.   Postage, office expense, communication

18    expense, mainly cell phones, some travel.  Could be

19    meals.

20         Q.   You said that Mr. Nichting didn't like or

21    didn't want to allocate certain costs that the parent

22    was incurring that might have been allocated across

23    to the business units.  Did he ever express to you

24    the reasons why?

25         A.   He said he got a cleaner -- a cleaner vision
```

*O'BRIEN - Examination*

1    of each business unit.

2          Q.   Without allocation of those costs?

3          A.   Yes.

4          Q.   In your view does PMP owe Planet Group for

5    cost allocations other than employees?

6          A.   For cost allocations?

7          Q.   Yeah.  Costs that are at the parent, but not

8    being -- but, per Mr. Nichting, not being allocated

9    to PMP?  In other -- and let me back up.

10         So Mr. Nichting likes to see -- I think what

11   you said, he gets a clearer vision of the companies

12   without allocation.  But my question is, does PMP,

13   regardless of what allocation has been put in place

14   or hasn't, does PMP owe Planet Group for allocation

15   other than employee allocation?

16         A.   Does it owe.  So --

17              MR. KING:   Form.  Go ahead.

18         A.   -- I believe that if Planet Group does not

19   invoice PMP for rent, for example, that PMP doesn't

20   owe any rent.  Does that answer your question?

21         Q.   (By Mr. Wright)  I think so.  And is Planet

22   Group -- is PGI invoicing PMP for anything other than

23   employee costs?

24         A.   Yes, but only if there was a direct cost.

25   For example, if there was a software license that PMP

*O'BRIEN - Examination*

```
 1    needed for its business unit, then if that software

 2    was bought through Planet Group, it would be

 3    invoiced -- or, it would be paid by Planet Group, but

 4    then invoiced down to PMP.  So anything that's

 5    directly identifiable as a PMP expense, it could be

 6    bill- -- invoiced and owed.

 7         Q.  There was talk earlier about the

 8    subcontractor agreements with what I believe were

 9    some former employees of the PMP.  Do you recall

10    that?

11         A.  Yes.

12         Q.  Have you seen those documents?

13         A.  I have seen some of those documents, yes.

14         Q.  Okay.  How recently?

15         A.  Within the last 30 days.

16         Q.  Okay.  Do they allow the other signer to the

17    documents to terminate them at will?

18         A.  At will?  Um...

19         Q.  Okay.  Or is there a termination notice

20    period?

21         A.  There is a termination provision in the

22    agreement, and I believe it says that -- I'd be

23    speculating.

24              MR. KING:  Yeah.

25         A.  I don't recall the terms.
```

*O'BRIEN - Examination*

1          Q.  (By Mr. Wright)  All right.  Are these

2    documents all basically the same form of document,

3    but signed by different people?

4          A.  Pretty much.

5          Q.  And where are they?  Are they at the -- does

6    your counsel have a copy?

7               MR. KING:  I do.

8               MR. WRIGHT:  Is that something you'd agree

9    to share with us?

10              MR. KING:  Yeah.  We can talk about that.

11              THE WITNESS:  Not the names.

12              MR. KING:  Yeah.  The names we're a little

13   bit concerned about, obviously.  There is a

14   nonsolicit clause in the agreement -- a noncompete,

15   not a nonsolicit.

16              MR. WRIGHT:  It's not a nonsolicit.

17              MR. KING:  I don't think it is.

18              THE WITNESS:  You're speculating.

19              MR. KING:  I am speculating.  Well, there's

20   [indiscernible].  I am not under oath.  But we'll

21   work with you on that.  Obviously, my concern about

22   that is contacting of these individuals that we have

23   noncompetes with, along with the identification of

24   the employees.  And that's why we're objecting to the

25   confidentiality and disclosure of those if...

*O'BRIEN - Examination*

1            MR. WRIGHT:  Well, it seems like we -- let

2    us see the contracts with the names blacked out, and

3    we can discuss later whether we're entitled to the

4    names.

5            MR. KING:  Yeah.  That's agreeable.

6            MR. WRIGHT:  I don't think I have any other

7    questions.

8            TRUSTEE JENSEN:  Thank you, Mr. Wright.

9            Mr. White, would you like to enter your

10   appearance?

11           MR. WHITE:  Thank you.  It's Frank White

12   for Worldpay U.S., Incorporated.  And I -- just I am

13   looking back through my notes.  I don't believe I

14   have anything more for Mr. O'Brien.

15           TRUSTEE JENSEN:  All right.  Thank you,

16   sir.

17           MR. WHITE:  Thank you.

18           TRUSTEE JENSEN:  Are there any other

19   parties that would like to ask any questions?

20           MR. ADAMS:  Yes.

21           TRUSTEE JENSEN:  Sure.  Go ahead and enter

22   your appearance.

23           MR. ADAMS:  Aaron Adams with TSYS

24   Transfers.  And I have just two, kind of, follow-up

25   questions to what Mr. Grams asked earlier, more

1    clarification.

2                      EXAMINATION

3    BY MR. ADAMS:

4         Q.   The first one relates to the -- you had

5    talked about there was a -- approximately a million

6    dollars less revenue from '14 to '15.  Can you kind

7    of walk through your reasoning behind that again?  I

8    didn't quite under- -- hear it all the way through.

9    I just wanted to either -- rearticulate your answer

10   for that one, please.

11        A.   Yeah.  More than likely it's the result of

12   two -- two issues.  One is the amount of custom work

13   we do --

14        Q.   Okay.

15        A.   -- for our customers.  Sometimes the

16   customers ask us to do a lot of work during the year

17   and other years they don't ask for much.  So that can

18   cause our revenue to fluctuate.

19             The second reason is the sale or license of

20   software.  So that tends to be lumpy.  That happens

21   one time.  And our -- we've had some products in

22   recent years, like TRR, VR, AmEx OnePoint, AmEx

23   OptBlue, these are all new modules that are built

24   around A360.  And some of the customers license some

25   of those products from us.  And that would have

O'BRIEN - Examination

1    caused the lumpiness in revenue.  That's my best

2    guess.

3        Q.  So you're suggesting that in that particular

4    case for those modules that they were only buying

5    them in '14 and not necessarily in '15.  That's what

6    would have caused the revenue to go down as a -- as

7    an additional by-product of the noncustom work?

8        A.  That's my guess.

9        Q.  Okay.  If the four customers have -- again,

10   this is just a clarification based on your testimony

11   earlier.  If the four customers have rejected the

12   contracts and your goal is to sell this software in a

13   better form, how are you obtaining the -- as example,

14   the April spec -- specs for the April reg release?

15       A.  We don't have the April specs, to my

16   knowledge.

17       Q.  How would you go about getting those if

18   you've rejected all four clients' con- -- or, four

19   customers' contracts?

20       A.  I don't know.

21           MR. ADAMS:  Okay.  That's all I have?

22           TRUSTEE JENSEN:  Okay.  Thank you.

23           Any follow-up questions?

24           MR. GRAMS:  I don't have any.

25           TRUSTEE JENSEN:  Mr. King, do you have any

*O'BRIEN - Examination*

1   questions?

2          MR. KING:  I just have one follow-up

3   question.

4                    <u>EXAMINATION</u>

5   BY MR. KING:

6          Q.  Okay.  So is it possible that you can enter

7   into another contract with another customer, not one

8   of the customers in this case, and that information

9   could be provided to you?

10         A.  Yes.

11         MR. WRIGHT:  And who might that customer

12   be?

13         Q.  (By Mr. King)  Do you know of any possible

14   customers?

15         A.  Yeah.  There are dozens and dozens of them

16   out there.

17         MR. KING:  I have nothing further.

18         TRUSTEE JENSEN:  Okay.  Thank you.  And do

19   any of the creditors want to leave the 341 meeting

20   open?  You asked some questions that you asked him

21   that he refused to answer, and I...

22         MR. GRAMS:  I think for right now, yeah.

23         TRUSTEE JENSEN:  Okay.  So I'll just -- I

24   am just going to leave it open with a right to

25   reserve the right to continue the meeting of

```
 1    creditors.  If you're unable to get the information
 2    and you need to have the judge determine whether or
 3    not certain questions they're required to answer, you
 4    can do that and...
 5              MR. KING:  Yeah.  That's agreeable.
 6              TRUSTEE JENSEN:  All right.
 7              THE WITNESS:  Can I do it -- can I do it by
 8    phone?
 9              MR. GRAMS:  Thanks very much.
10              TRUSTEE JENSEN:  Not -- not unless you go
11    to the U.S. Trustee's Office in San Diego and they
12    can swear you in maybe.  That might be a possibility.
13              THE WITNESS:  Okay.
14              TRUSTEE JENSEN:  And would be the only --
15    but -- and, I mean, I think it's unlikely, but -- and
16    I am hoping it's unlikely.  Normally you guys work it
17    out and get what you want, but it's -- there's a
18    possibility that...
19              (End of audio recording.)
20              §          §          §
21
22
23
24
25
```