# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

In Re:

PLANET MERCHANT PROCESSING, INC.,

　　　　　Debtor.

Case No. 16-81243

(Chapter 7)

Transcript of 341 First Meeting of Creditors held on March 30, 2017.  Mr. Thomas D. Stalnaker, Chapter 7 Trustee, presiding.

APPEARANCES:

　　　Mr. Dennis O'Brien
　　　　　Former Officer of the Debtor

　　　Mr. Sam King
　　　　　Attorney for Debtor

　　　Mr. Randy Wright
　　　　　Attorney for Creditor (EVO Merchant Services)

　　　Mr. Rob Shortridge
　　　　　Attorney for Creditors (Committee of Unsecured Creditors (TSYS Merchant Solutions, First American Payment Systems, EVO Merchant Services, and World Pay US Inc.))

　　　By Telephone:  Mr. Steve DeGroot
　　　　　Attorney for Creditor (EVO Merchant Services)

I certify that the foregoing is a true and correct transcript to the best of my ability of the hearing held on March 30, 2017 in front of Mr. Thomas D. Stalnaker, Chapter 13 Trustee.

The said hearing having been perpetuated by mechanical recording equipment and transcribed by the undersigned.

Dated that *24th* day of April, 2017.

Barbara G. Taylor
Legal Assistant
Baird Holm LLP
1700 Farnam Street
Suite 1500
Omaha, NE 68133

1   APPEARANCE.

2   EXAMINATION BY MR. STALNAKER:

3   Q.   Would you please state your name?

4   A.   Dennis O'Brien.

5   Q.   I have seen and I'm not sure that perhaps you have resigned, but at the time this case was filed, what was your position with the debtor?

6   A.   President of Planet Merchant Processing.

7   Q.   As you listen to a few cases, there are some questions that I am required to ask you that don't exactly fit the corporate situation, but some of them I do need to ask. You'll just have to bear with me.

8   Q.   Did you sign the petition schedule statements and related documents and is this signature yours?

9   SK:   Do you know what he's talking about?   The bankruptcy petition to start this case.

10   DB:   To convert?

11   SK:   Not to convert.  No.

12   DB:   Yes.

13   Q.   Did you read them before you signed them?

14   A.   Yes.

15   Q.   Are you personally familiar with the information contained therein.

16   A.   Yes.

17   Q.   To the best of your knowledge, is that information correct?

18    A.    Yes

19    Q.    Are there any errors or omissions that you're aware of?

20    A.    No.

21    Q.    At the time of filing, were all of the assets of the debtor listed?

22    A.    Yes.

23    Q.    On those schedules, accounts receivables are listed at $409,000, as far as
you know have all those been collected or challenged?

24    A.    They have not all been collected.  I don't know why they haven't been
collected.  The customer wouldn't pay.

25    Q.    There was some type of a dispute.

26    A.    I don't know why they didn't pay.

27    Q.    Do you know approximately how much is unpaid?

28    A.    No.

29    Q.    At the time of the filing, were all the debts owed by the debtor listed in the
schedules?

30    A.    Yes.

31    Q.    During the Chapter 11 were there additional creditors that did not get paid.

32    A.    No.

33    Q.    I have a copy of the tax return here which as I understand, it was delivered
to the U.S. Trustee's office at the commencement of the Chapter 11, is that correct?

34    A.    Yes.

35    Q.    This is a consolidated return of Planet Group, Inc. and Planet Merchant
Processing would be included in this, is that correct?

36   A.   Yes.

37   Q.   This is a 2015 return.  As far as you know, is that the most recent return that was filed?

38   A.   Yes.

39   Q.   Based on the schedules, it does not appear that the debtor owned any real estate.  Would that be correct?

40   A.   Yes.

41   Q.   And also no vehicles?

42   A.   Correct.

43   Q.   The schedules do list office equipment valued at $267,000.  As far as you know, is that office equipment and furniture still in the same location that it was when you filed?

44   A.   Yes.

45   Q.   There's an intention to try to sell the assets of this debtor.  It is my understanding that you did contact Flexpoint Ford.  Is that correct?

46   A.   Yes.

47   Q.   Did you give them a range of prices that the debtor would sell for or the type of bid we were looking for?

48   A.   I don't recall.

49   Q.   Have you contacted anybody else?

50   A.   Yes.

51   Q.   Who would that be?

52   A.   EVO Payment Systems.

53   Q.   Is that the only one?

54   A.   No.  Are we talking about throughout the bankruptcy?

55   Q.   No.  I'm talking about in the last couple of weeks or so?

56   A.   No.

57   Q.   Since the conversion?

58   A.   I haven't done anything for the debtor since the conversion.

59   Q.   But you did talk to someone at Flexpoint Ford?

60   A.   Not for the debtor.

61   Q.   Anybody else that you talked to like that?

62   A.   I haven't called anyone as a representative of the debtor.

63   Q.   Did you talk to them about possibly purchasing the assets of the debtor?

64   A.   I don't understand my role here.  My understanding is that I'm here to
answer questions for the debtor and I resigned for the debtor immediately upon
conversion.  Anything after that conversation date, I haven't done anything for the debtor.

65   Q.   If you're contacting potential buyers and I don't care who you say you're
representing, I think that as Trustee, I need to know who you have contacted and what
you might have suggested to them as a potential opening bid at least.

66   A.   To my knowledge, I haven't given anybody any indication of price with
the exception of EVO Payment Systems.

67   Q.   What did you tell them?

68   A.   In terms of what?

69   Q.   You said that's the only one you've given a price to.

70   A.   Price for?

71   Q.   The assets. Software.

72   A.   I didn't give them a price for the software.

73   Q.   Okay. What else is there besides the furniture and equipment?

74   A.   Planet Group has a couple dozen employees who are very familiar with this product and they would be a valuable part of the business.

75   Q.   I understand that, but specifically those are not "assets" of the debtor and the debtor has no control over them.

76   A.   Right.

77   Q.   I'm interested in being able to sell what the debtor does own.

78   A.   Correct. I understand.

79   Q.   So you haven't talked to anybody about that?

80   A.   I haven't given anybody a price as to what I thought it is worth.

81   Q.   Right now that's what I have for questions. Mr. Wright.

82   RW.   I'm going to let Mr. Shortridge go first if that's alright.

83   RS.   Mr. O'Brien could you briefly describe what's the debtor's software product. What are their products?

84   SK.   Objection. Form. Go ahead and answer to the extent you can.

85   DO.   The debtor's assets in addition to the furniture and equipment listed on the schedules also has software and has a primary module called A360 which stands for Acquire 360. That software facilitates back end processing for those who process credit card transactions for the associations. There are ancillary modules around the A360 software.

86   RS.   Do those modules have names?

87   A.   One is called Transaction Repair and Replace.  One is called Exceptions 360 (sometimes referred to as E360).  There's another one called Balance Reconciliation. There's another one we call AMEX OnePoint.  That's all I can think of.

88   Q.   Besides the software does the debtor also own the manuals, instructions and other type similar to manuals and instructions related to the software?

89   A.   Yes

90   Q.   Who has current access to the debtor's software products?

91   A.   Currently?

92   Q.   Currently.

93   A.   I don't know.

94   Q.   Do you know many licenses the debtor has given to the software products?

95   A.   During the whole history of time?  I don't follow the question.

96   Q.   Currently in force?

97   A.   How many licenses are outstanding?

98   Q.   Right.

99   A.   I can tell you the one's I know about and those would be the four customers that you represent.  I'm not aware of any others.

100   Q.   Are you aware of any party that has access to the debtor's source code?

101   A.   Today?

102   Q.   Today.

103   A.   I really don't know.

104   Q.   The debtor's parent corporation, I believe, Mr. Stalnaker said is Planet Group Inc.  Is that correct?

105   A.   Yes.

106   Q.   Planet Group Inc. owns 100% of the debtor's stock.  Is that correct?

107   A.   Yes.

108   Q.   Does Planet Group Inc. have access to the debtor's software source code?

109   A.   I don't know.

110   Q.   Are Planet Group Inc. employees working on the debtor's software today?

111   A.   I don't know.

112   Q.   How many employees does the debtor currently have?

113   SK   Objection.

114   A.   None.

115   Q.   Has the debtor ever had any employees?

116   SK.   Objection.  Foundation.

117   A.   Not to my knowledge.

118   Q.   Has the debtor ever issued W2s to any employees?

119   A.   Not to my knowledge.

120   Q.   Has the debtor ever had an employment contract with an employee?

121   A.   Not to my knowledge.

122   Q.   Has the debtor ever represented to potential buyers that the debtor has 33
direct employees?

123   A.   Could you repeat that question?

124   Q.   Has the debtor ever represented to potential buyers that the debtor has 33
direct employees?

125   A.   Not to my knowledge.

126   Q.   Has Planet Group Inc. offered its employees any share of the profits from any future sale of the debtor's software.

127   SK.   Foundation.

128   A.   You would have to ask Planet Group Inc. that.

129   Q.   Have you ever been employed by Planet Group Inc.?

130   A.   Employee?

131   Q.   Yes.

132   A.   This is like the Ivanka Trump question.  I am an officer today of Planet Group Inc., but I've never been paid by Planet Group Inc. so I'm not sure if that makes me an employee or not.

133   Q.   Are you a director of Planet Group Inc.?

134   A.   No.

135   Q.   What is your officer title with Planet Group Inc.?

136   A.   Vice president.

137   Q.   But as vice president of Planet Group Inc., you have no knowledge if the employees have been offered a share of the profits from the sale of the debtor's assets?

138   A.   I have knowledge, but I'm not here representing Planet Group Inc.  You're going to have to talk to Planet Group Inc.

139   Q.   Who would I need to talk to at Planet Group Inc. to learn that?

140   A.   The board of directors?  I think you should go to the board of directors.

141   Q.   Has the debtor conducted any efforts to sell the software or its assets since the conversion?

142   SK.   Foundation.

143   A.   You asked if the debtor has attempted to sell the assets since the conversion. Not to my knowledge.

144   Q.   To your knowledge has Planet Group Inc. had any discussions in an attempt to sell all or part of the debtor's assets?

145   SK.   Foundation.

146   A.   Again that's outside the scope of why I'm here.

147   Q.   Do you not know or you believe its outside the scope?

148   A.   Outside the scope.

149   Q.   West Partners LLC.  Ss that the parent corporation for Planet Group Inc.?

150   A.   Parent corporation?  Define parent corporation.

151   Q.   Could you explain the relationship between West Partners and Planet Group Inc.?

152   A.   West Partners owns various equity securities of Planet Group Inc. and West Partners has loaned money as a lender to Planet Group Inc.

153   Q.   Do you know who the controlling shareholder of Planet Group Inc. is?

154   A.   Yes.

155   Q.   Who is that?

156   A.   West Partners.

157   Q.   Since the conversion, has West Partners had any discussions with parties interested in purchasing all or part of the debtor's assets?

158   SK.   I'm going to object to that question on foundation and I think it also goes beyond the scope of this examination.  If you want to focus on what the debtor knows in his role as representative, I think he can answer those questions.

159   RS.   Will you instruct him not to answer?

160   SK.   What question?

161   RS.   The last question.

162   SK.   I don't represent West Partners.  He's going to have to make that decision.

163   A.   Go ahead and repeat the question please.

164   Q.   Since the conversion, has West Partners had any discussions with parties interested in purchasing all or a part of the debtor's assets or business?

165   A.   You'll have to ask West Partners.

166   Q.   Previously the debtor engaged Raymond James in an attempt to sell its business.  Is that correct?

167   A.   Yes.

168   Q.   Were there parties that expressed an indication of interest in the debtor's business?

169   A.   Yes.

170   Q.   Who were those parties?

171   SK.   I'm going to interpose an objection at this time.  This is an issue that we've raised before about disclosure of this information to customers.  Particularly customers who may be bidders in this process.  So I'd object to the disclosure of that information unless the customers aren't going to be bidders in this process in any sale of the debtor's assets.

172   RS.   Are you instructing him not to answer?

173   SK.   I am instructing him not to answer until we get that issue resolved.

174   Q.   Were any bids received by Raymond James?

175    A.    Define bid.

176    Q.    Indications of an intent to make an offer to purchase all or a part of the debtor's assets.

177    A.    Yes.

178    Q.    How much were those indication of offers or bids?

179    SK.    I'm going to object to that as well for the same reason.  I also think that those issues, that information has been disclosed to the Trustee.  If you have those questions, you can talk to the Trustee about it.

180    Q.    During the pendency of the Chapter 11 proceedings, who decided to make the payments to Planet Group Inc.?

181    SK.    Foundation?

182    A.    Decided to make payments?  I authorized the payments after consulting with the debtor's attorney.

183    Q.    How did you decide which invoices were paid by the debtor during the Chapter 11 proceeding?

184    A.    First in, first out.

185    Q.    Has the debtor asked Planet Group Inc. to return any of the payments the debtor made to Planet Group Inc. over the last year?

186    A.    No.

187    RS.    I have nothing further.

188    RW.    Mr. O'Brien, you made a reference to something I wrote down and I'm not sure I got it right.  Flexpoint Ford?  Is that what I heard?

189    A.    I don't know what you heard.

190   Q.      Are you familiar with somebody called Flexpoint Ford?

191   A.      Yes.

192   Q.      Are they a potential buyer of some asset related to the debtor?

193   SK.     Foundation?

194   A.      Flexpoint Ford I believe is a private equity firm that has ownership in a
processor/ISO. I'm not sure which they are. ISO or processor. That's who they are.

195   Q.      Have you had discussions with them that somehow relate to the software
owned by the debtor in this case?

196   A.      I did while we were in Chapter 11 bankruptcy.

197   Q.      Did that firm suggest it had an interest in purchasing any of those assets?

198   A.      It indicated that it had an interest in acquiring the business of Planet
Merchant Processing.

199   Q.      Has that information been given to the Trustee, Mr. Stalnaker?

200   SK.     Yes.

201   A.      I don't know.

202   Q.      When was the last time you had a conversation with that firm Mr.
O'Brien?

203   A.      I'm only here to talk about up until the time I resigned. I'm guessing it was
within 60 days prior to the conversion date.

204   Q.      Were any dollar figures discussed in your conversations with this firm?

205   A.      I don't believe so.

206   Q.      You didn't throw out numbers? They didn't throw out numbers?

207   A.      That's correct.

208   Q.    No written proposals were received either by email, letter, or communication of any written kind?

209   A.    That's correct.

210   Q.    You talked earlier about not giving an indication of price to any potential buyers except for EVO Payment Systems, my client. Is that right?

211   A.    Prior to the conversion? I think the question was asked after the conversation.

212   Q.    Correct.

213   A.    And that was my response.

214   Q.    That you gave an indication of price to EVO Payment Systems?

215   A.    For the business. Yes.

216   Q.    When you say "the business," what do you mean?

217   A.    I mean employees and products where you put Humpty Dumpty back together again. Then you have a business. Otherwise you have employees here and a product there and you really don't have a business. Does that make sense?

218   Q.    Yes. Although, am I correct that Planet Group Inc. doesn't own the employees?

219   SK.   Foundation?

220   A.    It employs the employees.

221   Q.    Does Planet Group Inc. have anything else to sell as part of the business other than its relationship with the employees?

222   A.    You would have to ask Planet Group Inc.

223   Q.    You're an officer of Planet Group Inc.

224  A.   I'm not here representing Planet Group Inc.

225  Q.   Are you refusing to answer that question?

226  A.   Yes.

227  Q.   You realize that the sale of the company's assets, of the debtor's assets, in this case, is tied very closely to what Planet Group Inc. has or believes it has.  Do you understand that?

228  SK.   Objection.  Foundation?

229  A.   I don't know what you're inferring.

230  Q.   I'm inferring that the assets of PMP are tied closely to PGI and therefore the Trustee's ability to sell those assets relates to PGI.

231  SK.   Foundation?

232  Q.   Do you not understand that?

233  A.   I heard what you said, but I didn't hear a question.

234  Q.   The question relates to efforts of Planet Group Inc. of which you are an officer to sell assets that includes those owned by the debtor.  And you said I would have to ask Planet Group Inc. about what it has to sell that relates to the debtor's assets other than the employees.

235  SK.   I object.  That misstates his testimony.

236  Q.   Do you know anything that Planet Group Inc. has to sell that relates to the assets of the debtor other than the relationship with the employees?

237  SK.   Foundation?

238  A.   I don't understand what you're asking.

239  Q.   You made a reference to the business.

240   A.   Yes.

241   Q.   The business you said includes Planet Group Inc.'s relationship with its employees.  My question is, is there anything else or other part of the business that is owned by Planet Group Inc. other than its employees?

242   A.   I don't know.

243   Q.   Who would know?

244   A.   I don't know that either.

245   Q.   You were asked a question by Mr. Shortridge about who is working on the software that's owned by the debtor today.  I'm going to broaden that question a little bit. Do you know of anyone at Planet Group Inc. who is, since the conversion, working on the software that belongs to the debtor?

246   A.   I'm not here as a Planet Group representative.  I'm only here to discuss what happened at PMP while I was the president of PMP.

247   Q.   My point is the two are inextricably tied together.  Do you have that knowledge and you just don't want to say it?

248   SK.   Objection form. Foundation.

249   Q.   Do you know who has been working on the debtor's software?

250   A.   I know who was working on the debtor's software at the time the conversion happened.

251   Q.   What about after the conversion?

252   SK.   Objection.  Foundation?

253   A.   I don't know.

254   Q.   Does Sherry Maguire know?

255   A.   Yes.

256   Q.   Do you know how many employees of Planet Group Inc. are currently dedicated to any portion of work related to the software?

257   SK.   Form. Foundation.

258   A.   I know how many employees there were up until the time of conversion.

259   Q.   You're still an officer of Planet Group Inc.  Did your knowledge of Planet Group Inc. stop when you resigned from Planet Merchant Processing?

260   A.   Did my knowledge stop?

261   Q.   Yes.   Because you said you don't know what's happened since the conversion.

262   A.   I don't know.  I don't know what's happened.

263   JN.   I was going to sit in the back, but I think it's about time Planet Group's lawyer makes an appearance.  Would you please enter the appearance of James Niemeier on behalf of Planet Group Inc.?

264   JN.   What was your question again Mr. Wright so that I can respond appropriately.

265   RW.   Which one?

266   JN.   Whatever the last one was.

267   RW.   I have to have it read back to me.

268   JN.   We don't have that capability today so if you have another one, we can go from there.

269   RW.   Another question that was asked was who has access to the Planet Merchant Processing source code?  Do you know anyone who has access to that source

code?

270   A.   Currently?

271   Q.   Currently.  Let's start with currently

272   SK.   Form and foundation.

273   A.   I can tell you who had access to my knowledge up until the time of conversion.

274   Q.   You still work for Planet Group Inc., correct?

275   SK.   Objection.  Form.

276   A.   I am an officer and the vice president of Planet Group Inc.

277   Q.   And who had access to the source code before the conversion?

278   A.   Certain employees of Planet Group Inc. who were working exclusively on PMP business.

279   Q.   How many were there?

280   A.   I don't know how many actually physically get the source code.  I don't know how many.

281   Q.   Have any of those employees continued to have access to the source code since the conversion?

282   SK.   Foundation

283   A.   I don't know.

284   Q.   Do you work at the Omaha location of Planet Group Inc.

285   A.   No.

286   Q.   Where do you work?

287   A.   Carlsbad, California.

288   Q.   Who is in charge of the Omaha location of Planet Group Inc.?

289   SK.   Foundation.

290   A.   Today?  Or at the time of conversion?

291   Q.   To the last best knowledge you have.

292   A.   The board of directors.

293   Q.   Who is the highest up officer or manager of Planet Group Inc. working in

Omaha?

294   SK.   Foundation.

295   A.   At the time of conversion, I don't know.  I don't know is the answer.

296   Q.   Does Sherry Maguire work for Planet Group Inc.?

297   A.   Yes.

298   Q.   What is her title?

299   A.   Her title at the time of conversion was chief technology officer of PMP.

300   Q.   But she now works for Planet Group Inc.?

301   A.   She's always worked for Planet Group Inc.

302   Q.   So she's had more than one title?  She had a title for Planet Group Inc. and

a title Planet Merchant Processing?

303   A.   I don't think so.  Not to my knowledge.

304   Q.   She was an employee of Planet Group Inc.?

305   A.   Yes.

306   Q.   What was her title?

307   A.   I believe it was chief technology officer of PMP.

308   Q.   As of conversion, was there anybody above her on the organizational chart

of the company of PGI in Omaha?

309    JN.    PGI or PMP?  You've been going back and forth.

310    RW.    I said PGI.

311    A.    At the time of conversion.  I'm not trying to be evasive here.  I can't recall

the timing of when Tom Nichtine left is my problem.

312    Q.    So it's either Tom Nichtine or Sherry Maguire who is the highest ranking

PGI officer in Omaha?  Is it between those two?

313    A.    I don't know.

314    SK.    I object as to foundation.

315    A.    I don't know is the answer.

316    Q.    I don't think I have any more questions.

317    TS.    That will conclude this 341 meeting.